UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>UNDERDOG EXCHANGE DCM, INC. and UDM, LLC d/b/a UNDERDOG PREDICT,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DEAN SERPA, in his official capacity as Executive Director of the Massachusetts Gaming Commission; JORDAN MAYNARD, in his official capacity as Chair and Commissioner of the Massachusetts Gaming Commission; EILEEN O’BRIEN, in her official capacity as Commissioner of the Massachusetts Gaming Commission; BRADFORD R. HILL, in his official capacity as Commissioner of the Massachusetts Gaming Commission; NAKISHA SKINNER, in her official capacity as Commissioner of the Massachusetts Gaming Commission; and PAUL BRODEUR, in his official capacity as Commissioner of the Massachusetts Gaming Commission,<br><br>Defendants.</td><td>Civil Action<br>No. 26-14098</td></tr>
</table>

**COMPLAINT FOR DECLARATORY**
**<u>JUDGMENT AND INJUNCTIVE RELIEF</u>**

Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict (“Underdog”), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1. This action seeks to prevent the Attorney General of the Commonwealth of Massachusetts ("Attorney General") and the members and officials of the Massachusetts Gaming Commission ("Gaming Commission") (collectively, "Defendants") from unlawfully exercising jurisdiction over, regulating, or terminating Underdog's offering of lawful derivatives contracts on federally regulated markets.

2. Underdog operates a federally regulated designated contract market ("DCM") that lists event contracts for trading in interstate commerce. Underdog is also a federally registered futures commission merchant ("FCM") that solicits or accepts orders for the purchase or sale of event contracts traded on other DCMs. Through the Commodity Exchange Act ("CEA"), Congress vested the U.S. Commodity Futures Trading Commission ("CFTC") with sole regulatory authority over event contracts and other derivatives traded on designated contract markets, including deciding whether to prohibit certain event contracts—such as contracts related to gaming—as contrary (or not) to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). According to the CEA and CFTC, "event contracts" are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."[1]

3. Pursuant to its DCM and FCM designations, Underdog offers event contracts in Massachusetts. Since the CFTC has "exclusive jurisdiction" to regulate trading on DCMs, including through FCMs, under the CEA, 7 U.S.C. §§ 1 *et seq.*, Underdog's compliance

---

[1] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

with CFTC approval procedures authorizes Underdog to offer and facilitate the trading of event contracts in Massachusetts. Nevertheless, Underdog now faces the imminent threat that Defendants will enforce Massachusetts's gambling and sports wagering statutes against its federally regulated market. Indeed, the Attorney General has already brought an enforcement action against KalshiEX LLC ("Kalshi"), a DCM, and obtained a preliminary injunction—since stayed pending Kalshi's appeal—barring Kalshi from offering sports-related event contracts to any person located in Massachusetts.

4. Like Underdog, Kalshi is regulated by the CFTC. Even so, Defendants assert that, notwithstanding that the CFTC has exclusive jurisdiction to regulate DCMs and FCMs, event contracts traded on DCMs and through FCMs are "sports wagering," "wagers," and "illegal gaming" subject to Massachusetts gaming laws. *See* First Amended Complaint ¶¶ 6-10, 111-15, 131-34, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86.

5. Any enforcement action by Massachusetts would be meritless. Defendants' threat of enforcement is plainly inconsistent with Article VI, Clause 2, of the United States Constitution ("Supremacy Clause") and any enforcement efforts are therefore preempted. The CFTC has confirmed its position that Massachusetts's enforcement of its gambling laws against CFTC-designated contract markets violates the Supremacy Clause. *See* Brief for CFTC as Amicus Curiae Supporting Defendant-Appellant, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026); *see also infra* ¶ 79.[2] It has echoed this sentiment in each of the

---

[2] *See also* Press Release No. 9219-26, CFTC, CFTC Reaffirms Exclusive Jurisdiction Over Prediction Markets in Massachusetts Supreme Judicial Court Filing, Release No. 9219-26 (Apr. 24, 2026), https://www.cftc.gov/PressRoom/PressReleases/9219-26 (issuing warning "[t]o any state that seeks to nullify federal law and seize authority over these markets . . . we will see you in court").

amicus briefs, motions to intervene, and eight litigations it has filed across the country seeking to enforce its exclusive jurisdiction over derivatives trading on DCMs. *See infra* ¶¶ 63-64, 79-80.

6. Congress was explicit with its intent in enacting the CEA and giving the CFTC exclusive jurisdiction: because derivatives transactions are "affected with a national public interest," it was essential to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5. Accordingly, federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[3] As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

---

[3] *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA" (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 CIV. 11602(RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (dismissing state law claims as preempted by the CEA because they "would directly affect 'trading on or the operation of a futures market'" (citation omitted)).

7. Consistent with Congress's original purpose, each amendment to the CEA over the past century has only reinforced its intent to maintain a uniform system. For instance, Congress expanded the CFTC's exclusive authority to cover new products, including swaps and contracts on "excluded commodities," and authorized the CFTC to review and prohibit certain event contracts if it determines that their trading would be contrary to "the public interest." 7 U.S.C. § 7a-2(c)(5)(C). Consistent with its role, the CFTC has adopted regulations regarding when and how an event contract may be suspended as contrary to the public interest and has published copious guidance on its approach, most recently issuing a Notice of Proposed Rulemaking on the topic. *See* 17 C.F.R. § 40.11; Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40). This Notice of Proposed Rulemaking would amend 17 C.F.R. § 40.11 to define the enumerated categories of event contracts, including "gaming," and the factors the CFTC may consider to determine whether an event contract is "contrary to the public interest." *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. at 35,859-61.

8. Underdog thus seeks declaratory and injunctive relief to protect its ability to operate federally regulated markets in Massachusetts. Any attempt by Massachusetts to regulate trading on DCMs (including through FCMs) is expressly preempted. Congress grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps," such as event contracts. 7 U.S.C. § 2(a)(1)(A).

9. Massachusetts' regulation of trading on DCMs (including through FCMs) is also preempted because Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws including state licensing or registration conditions that Massachusetts might purport to apply to Underdog.

10. Lastly, Massachusetts' regulation of trading on DCMs (including through FCMs) that would require Underdog to cease offering federally authorized event contracts is additionally preempted because it directly conflicts with the CEA's framework. Underdog cannot comply with both its federal law obligations and any purported obligations under Massachusetts law. Moreover, ceasing operations in Massachusetts would, among other things, undermine the CEA's goals of creating a uniform system of derivatives trading and violate CFTC guidance intended to promote uniform and fair markets. Indeed, it would cause the exact harm the CEA sought to prevent: traders could open a position outside of Massachusetts, travel to Massachusetts, and, while there, lose the ability to close or expand their existing position due to Massachusetts's application of its gaming laws.

11. The threat of Defendants' enforcement of Massachusetts law poses a direct and imminent threat to Underdog's business and its users, and leaves Underdog with a "Hobson's choice" wherein both its options will cause irreparable harm. *Morales v. Trans World Airlines*, *Inc.*, 504 U.S. 374, 381 (1992). Either Underdog can continue to operate in Massachusetts, "expos[ing] [itself] to potentially huge liability," including civil and criminal penalties, reputational damage, and competitive disadvantage, or it can "suffer the injury of obeying [Massachusetts's] law" despite the fact that it is preempted. *Id.*

12. In light of the imminent threat it faces as a result of Defendants' intention to wrongfully enforce Massachusetts law, Underdog brings this action to protect its right to offer event contracts pursuant to federal law and regulation, maintain the integrity of the federal regulatory framework, and avert imminent harm to its business operations.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Massachusetts law is preempted by the CEA as applied to Underdog's event contracts. And the Court has the power to declare the rights and legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. § 2201.

14. The Eleventh Amendment does not bar this action. Underdog sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. Under *Ex parte Young*, 209 U.S. 123, 155-56 (1908), federal courts may "enjoin state officials to conform future conduct to the requirements of federal law." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015); *see also Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002).

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2). The individual defendants reside in the state and at least one individual defendant performs their duties and thus resides in this District. A substantial part of the events giving rise to the claims also occurred in this District.

## PARTIES

16. Plaintiff Underdog Exchange DCM, Inc. is a Delaware corporation headquartered in Brooklyn, New York. It operates a DCM regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

17. Plaintiff UDM, LLC, doing business as Underdog Predict, is a Delaware limited liability company headquartered in Brooklyn, New York. It is an FCM regulated by the

National Futures Association ("NFA") and the CFTC under the CEA, offering event contracts traded on other CFTC-registered DCMs.

18. Defendant Andrea Joy Campbell is the Attorney General of the Commonwealth of Massachusetts and is sued in her official capacity. The Attorney General has authority to enforce Massachusetts law under G.L. c. 23N, § 4(g) and G.L. c. 12, § 10.

19. Defendant Dean Serpa is the Executive Director of the Massachusetts Gaming Commission and is sued in his official capacity. As Executive Director, Defendant Serpa is responsible for "administering and enforcing the provisions of law relative to the commission." G.L. c. 23K, § 3(i).

20. Defendant Jordan Maynard is Chair and Commissioner of the Massachusetts Gaming Commission and is sued in his official capacity.

21. Defendant Eileen O'Brien is a Commissioner of the Massachusetts Gaming Commission and is sued in her official capacity.

22. Defendant Bradford R. Hill is a Commissioner of the Massachusetts Gaming Commission and is sued in his official capacity.

23. Defendant Nakisha Skinner is a Commissioner of the Massachusetts Gaming Commission and is sued in her official capacity.

24. Defendant Paul Brodeur is a Commissioner of the Massachusetts Gaming Commission and is sued in his official capacity.

25. Together, Defendants Attorney General Andrea Joy Campbell, Jordan Maynard, Dean Serpa, Eileen O'Brien, Bradford R. Hill, Nakisha Skinner, and Paul Brodeur would be responsible for enforcing Massachusetts laws that are preempted by federal law.

Defendants have each exercised, or threatened to exercise, that enforcement authority against CFTC-regulated markets similarly situated to Underdog. *See infra* § I.

## FACTUAL ALLEGATIONS

### A. Underdog Operates Federally Registered Marketplaces For Trading Event Contracts

26. Underdog operates a federally regulated DCM that provides a marketplace for trading in derivatives products, including event contracts. Underdog is also a federally regulated FCM that allows traders to use its platform to trade event contracts listed on other CFTC-registered DCMs.

27. Underdog registered its FCM with the NFA and CFTC on January 9, 2026, confirming that its platform complied with the CEA.

28. The CFTC granted Aristotle Exchange DCM, Inc. its DCM designation on September 5, 2025, confirming that its market complied with the CEA. In March 2026, Underdog acquired Aristotle Exchange DCM, Inc. and its associated Derivatives Clearing Organization. Underdog announced the launch of its DCM on July 18, 2026.[4] On August 31, 2026, Aristotle Exchange DCM, Inc. filed a name change and is now named Underdog Exchange DCM, Inc.

29. From July 12, 2026 to September 2, 2026, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), (d), Underdog obtained CFTC certification for hundreds of event contracts.

---

4 Press Release, Underdog, Underdog Launches Prediction Markets on its own Exchange, (July 18, 2026), https://www.underdogsports.com/news/underdog-launches-prediction-markets-on-its-own-exchange.

30. On September 4, 2026, pursuant to its DCM designation and FCM designation, Underdog began offering its event contract listings to users located in Massachusetts.

**B. Congress Intentionally Vested The CFTC With Comprehensive And Exclusive Jurisdiction To Regulate Derivatives—Including Event Contracts—On Federally Registered Markets**

31. Derivatives are financial instruments used to allocate risk between counterparties. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The classic example is the grain futures contract, which permits buyers to mitigate the risk of volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date. However, the underlier of a derivative can vary widely, allowing market participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. Indeed, almost any type of risk can be hedged, as long as a CFTC-regulated market exists and a contract is available.

32. States have long viewed futures contracts with suspicion, equating trading on uncertain outcomes with gambling. Over a century ago, before the federal government began regulating derivatives markets, several states enacted outright bans on futures trading or subjected it to onerous restrictions under their gaming statutes. The resulting patchwork of often conflicting state regulation, poorly suited to facilitating a uniform national financial market, prompted Congress to take action.

33. First, Congress passed the 1922 Grain Futures Act, which required futures transactions for grain to be conducted on contract markets designated by the Secretary of Agriculture, centralizing trading on grain. Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, 1000 (1922).

34. Then, in 1936, Congress strengthened this federal scheme by enacting the CEA. The CEA established a uniform federal framework for regulating futures markets, extended federal authority to a broader class of commodities and created the Commodity Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. However, Congress did not yet establish an independent federal agency to comprehensively regulate the nation's derivatives markets. It also did not completely foreclose the application of state law, clarifying in the statute itself that the federal law would not impair the enforcement of applicable state laws. Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936).

35. As derivatives markets became more sophisticated and integral to the national economy, Congress worried that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156; *see also Leist*, 638 F.2d at 322 ("The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *DGM Invs.*, 2002 WL 31356362, at *4 ("'Congress' intent to bring the markets under a uniform set of regulations' followed from a fear that states might attempt to regulate futures markets themselves and thus 'subject the national futures trading apparatus to conflicting regulatory demands.'" (citation omitted)); *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") ("different State laws would just lead to total chaos" (statement of Sen. Clark)). Similarly, the House Agriculture Committee stressed the need to bring "all exchanges and all

persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 85 (1974).

36. Accordingly, in 1974, Congress enacted sweeping amendments to the CEA (the "1974 Act") and established the CFTC as an independent federal agency charged with regulating the national derivatives markets. And, to address the threat posed by conflicting state regulation, Congress added a provision expressly granting the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Congress also *eliminated* the 1936 provision providing that the CEA did not supersede or limit state jurisdiction "in order to assure that [f]ederal preemption [was] complete." 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

37. In subsequent amendments to the CEA, Congress continued to reinforce the importance of exclusive federal control over derivatives markets through a single agency—the CFTC. For instance, the 1992 Futures Trading Practices Act ("FTPA") expanded the CFTC's regulatory authority by permitting the CFTC to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Congress also brought any such exempt financial instruments within the scope of the CFTC's exclusive authority by supplementing the existing express preemption provision, *id.* § 2, with a provision explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. *Id.* § 16(e)(2).

38. Similarly, in 2010, Congress amended the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Once again, Congress expanded the CFTC's exclusive jurisdiction over derivatives markets. Congress added

exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from trading on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). The Special Rule explicitly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

39. Each iteration of the CEA has only reinforced Congress' intention to create a national market for derivatives products *despite* the concerns of individual states that derivatives markets should have remained under state control. Congress created a federal agency, vested it with exclusive jurisdiction, and centralized regulation over derivatives markets, granting the CFTC authority both to certify and prohibit derivatives products.

### C. The CEA And CFTC Regulations Establish A Comprehensive Federal Regulatory And Enforcement Framework For Trading Event Contracts

40. As a result of the CEA, the federal regulatory scheme governing the trading of derivatives, including event contracts, on DCMs and through FCMs is comprehensive and well-established.

41. To offer its derivatives for public trading, an entity must first be designated a contract market, or a DCM, by the CFTC. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R.

§ 38.3(a). The designation process is rigorous and requires the applicant to demonstrate compliance with the CEA's Core Principles as set out by the CFTC. *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d); *infra* § J.

42. Among other things, this requires the applicant to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

43. Once approved and granted designation, a DCM becomes subject to an expansive regulatory framework administered by the CFTC. DCMs have extensive continuing federal obligations, including prescriptive capital and liquidity requirements, participant eligibility standards, reporting obligations, recordkeeping mandates, and operational and governance standards—all directed toward compliance with the CEA's Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31, 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

44. Because of the breadth and rigor of this regulatory framework, a DCM earning the CFTC's designation is accorded the status of a self-regulatory organization under federal law. DCMs are entrusted with front-line enforcement responsibilities, including establishing and enforcing market rules, detecting and preventing market abuses, and ensuring the integrity of all listed products and intermediaries. *See* 17 C.F.R. § 1.3; *id.* pt. 38.

45. In addition to its regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

46. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division determines that a violation of the CEA has occurred, the CFTC may pursue civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and the suspension or revocation of registration and trading privileges. Criminal violations may be referred to the Department of Justice. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3.

47. Just like DCMs, FCMs are subject to comprehensive CFTC regulation. The CEA defines an FCM as "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). FCMs are required to register with the CFTC, *id*. § 6f; 17 C.F.R. § 3.10(c), and to comply with reporting requirements to the CFTC, *id.* §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id*. § 1.55, minimum financial requirements, *id*. §§ 1.12, 1.17, and recordkeeping requirements, *id*. §§ 1.14, 1.18. They must also "establish, maintain, and enforce" a risk management program and adhere to related reporting requirements. *Id*. §§ 1.11(c)(1), 1.15. Finally, FCMs must establish internal procedures to ensure compliance with

trading standards, *id.* § 155.3, and adopt written policies and procedures to ensure compliance with conflict of interest regulations, *id.* § 1.71.

**D. <u>Event Contracts Are Swaps Under The CEA</u>**

48. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, and are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i), that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *See* 7 U.S.C. § 1a(47) (defining "swap"), 7 U.S.C. § 7a-2(c)(5)(C)(i); § 1a(19)(iv); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").[5] FCMs can serve as an intermediary for trading swaps on DCMs.

49. The CEA defines "swap" broadly to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). It additionally includes as swaps any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

50. "[Event] contracts are not novel innovations." Brief for CFTC as Amicus Curiae Supporting Plaintiff at 7, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31. Since 1992, CFTC-registered exchanges have been listing derivatives with payouts based on events "as diverse as regional insured property losses, the count of bankruptcies,

5 Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

temperature volatilities, corporate mergers, and corporate credit events." *Id*. (quoting 73 Fed. Reg. 25669, 25671 (May 7, 2008)).

**E. Event Contracts Have Price Discovery Benefits, <u>Predictive Value And Allow Businesses To Hedge Risk</u>**

51. FCMs and DCM operators offering event contracts provide a neutral marketplace by matching counterparties to each other. They are not bookmakers. Unlike a casino, they do not set odds, assume directional risk, or take positions against their customers. Instead, they maintain a transparent marketplace with prices that reflect the supply and demand of a given position in real time.

52. Event contracts typically have a binary payoff structure dependent on the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

53. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date. Accordingly, event contracts have enormous predictive value because their price is set based on the market's aggregated expectations about whether the underlying event will occur.

54. Event contracts also allow businesses to hedge the risks associated with the occurrence or non-occurrence of a particular event, and thus act as a valuable risk

management tool. For instance, sports-related event contracts can be used to hedge risk in many scenarios, including:

a. Media, broadcasting, and event ticketing companies facing financial exposure tied to viewership, which can fluctuate significantly depending whether there is a work stoppage or labor strike in a given sport, how competitive or interesting a game is, or how well a given team or franchise is playing;

b. Retailers selling team merchandise or apparel who see major swings in sales depending on whether a popular team advances or a particular player wins;

c. Travel and hospitality businesses exposed to spikes and falls in bookings dependent on whether a local team advances or hosts an event;

d. Restaurants and bars located around major arenas serving drastically different numbers of customers depending on whether a major event occurs,[6] or whether additional games in the NBA finals are played in a particular arena;

e. Advertising and marketing agencies with client campaigns tied to event outcomes, including guaranteed audience metrics, sponsor-activation thresholds, or promotional triggers linked to competition results;

f. Businesses running promotions tied to game results; and

---

[6] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

g. Fantasy sports platforms and sports data providers relying on fan engagement and player performance.

55. This is not speculative. Companies such as Game Point Capital have already "arranged millions of dollars' worth of hedges through Kalshi."[7] Similarly, industry commentary has highlighted that event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[8] Indeed, these businesses can use Underdog to trade "yes" or "no" on an event contract regarding whether the MLB will have a "New [Collective Bargaining Agreement] Before Dec 2nd, 2026," i.e., whether a lockout will occur, and an event contract regarding whether "the first game of the 2027 MLB regular season [will] commence before March 25, 2027." Without the ability to hedge such risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations."[9]

---

[7] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html; Tarek Mansour (@mansourtarek_), X (Feb. 12, 2026, 3:38 P.M.), https://x.com/mansourtarek_/status/2022047766445535538?lang=en.

[8] *See* David Huber, Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations, Deadspin (Aug. 7, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations/ (emphasis in original); *see also* Joe Peta (@MagicRatSF), X (Aug. 4, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

[9] Huber, *supra* n.8.

56. The viability of event contracts' hedging function depends on the efficiency of the markets and thus relies on speculation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

57. As the CFTC has explained, "[i]n addition to their information aggregation, price discovery, and price dissemination functions, prediction markets allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists" such as "sporting events . . . that generate billions of dollars in economic activity and materially affect both regional and national markets." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,807-08 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

**F. The CFTC Has Exclusive And Discretionary Authority To Permit Or Prohibit Event Contracts**

58. A registered DCM is permitted to list new derivatives contracts—including event contracts—for trading without obtaining the CFTC's prior approval of each individual contract. Instead, the DCM must certify to the CFTC that each new contract complies with applicable regulatory standards by filing a written certification prior to listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC then has a period of time to review and object to the submission before listing. If it fails to act during that period, the contract is deemed "effective" and may be listed for trading. *See* 7 U.S.C. § 7a-2(c). The CFTC may also conduct a discretionary review after the contract has been listed.

59. Under the CEA's "Special Rule," Congress expressly granted the CFTC discretionary authority to prohibit trading on specific event contracts, including those that reference gaming, if they are "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

Congress did not authorize states to override or nullify federal authorization of event contracts by deeming them unlawful under state gambling law. *See* 17 C.F.R. § 40.11; 7 U.S.C. § 7a-2(c)(5)(C).

60. The CFTC has established procedures by which it may determine whether trading in a specific contract should be suspended and retains authority to initiate a formal review of any submitted contract under its own rules. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11. This includes a 90-day discretionary review period, during which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading. *See* 17 C.F.R. § 40.11(c). This mechanism ensures continued federal oversight while permitting market innovation to proceed without pre-approval delays for each new product.

61. On June 10, 2026, the CFTC issued a Notice of Proposed Rulemaking, proposing amendments to this discretionary review process. The proposed rule defines "gaming" and imposes three conditions that must occur before a contract may be deemed contrary to the public interest. *See* CFTC Release No. 9249-26. First, the agreements, contracts, transactions, or swaps must be based upon the occurrence, extent of an occurrence, or contingency. *Id.* Second, the agreements, contracts, transactions, or swaps must "involve" any of the enumerated activities (gaming, war, terrorism, assassination, and activities illegal under state and federal law). *Id.* Third, the CFTC must affirmatively determine that the agreements, contracts, transactions, or swaps are contrary to the public interest. *Id.*

## G. The CEA And The CFTC Have Confirmed The CFTC's Exclusive Authority Over Event Contracts Traded On DCMs And Through FCMs

62. To ensure uniformity in event contract markets and preserve the accuracy of event contract pricing, Congress granted the CFTC exclusive authority to regulate event contracts listed on DCMs and FCMs, including the event contracts Underdog offers directly and

as an intermediary, as a subcategory of derivatives. *See* 7 U.S.C. § 1a(47)(A)(ii), (iv), (vi); *supra* § B. Indeed, "event contracts" are specifically addressed in the CEA and in the Special Rule of the 2010 Dodd-Frank Act. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 7 U.S.C. § 1a(19)(iv).

63. The CFTC has further confirmed its exclusive authority to regulate event contracts listed on DCMs and FCMs through litigation. The CFTC has brought actions against the states and state regulators in eight states alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026). Additionally, the CFTC successfully moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), ECF No. 19. The CFTC has also submitted briefs as an amicus curiae in Michigan, Nevada, Ohio and Tennessee, and in the Supreme Judicial Court of Massachusetts in the Commonwealth's enforcement action against Kalshi. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026), ECF No. 63; Brief for CFTC as Amicus Curiae Supporting

Plaintiff, *QCX, LLC v. Nessel*, No. 26-1552 (6th Cir. Aug. 24, 2026), ECF No. 20; Brief for CFTC as Amicus Curiae Supporting Defendant-Appellant, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026).

64. The CFTC has also issued several notices, including Release No. 9194-26 (Mar. 12, 2026) and Prediction Markets Advisory (CFTC Letter No. 26-08), explaining that event contracts are "swaps" under the CEA. The CFTC's most recent Notice of Proposed Rulemaking, Release No. 9249-26 (June 10, 2026), once again confirmed that "Congress vested the Commission with 'exclusive jurisdiction' over 'transactions involving swaps'" and that event contracts are swaps. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,808-11 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

### H. Massachusetts Extensively Regulates Gambling And Sports Wagering

65. The Commonwealth contends that "the legalization and regulation of gambling are among the Legislature's core police powers," First Amended Complaint ¶ 2, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86 (quoting *Gattineri v. Wynn MA, LLC*, 493 Mass. 13, 20 (2023)), and that it maintains "strict sports wagering laws and regulations" that it enforces against any operator "offering unlicensed sports wagering to Massachusetts residents." *Id.* ¶ 6.

66. Under Massachusetts law, the Attorney General is charged with instituting "such criminal or civil proceedings . . . as [s]he may deem to be for the public interest," G.L. c. 12, § 10, and may bring a "civil action or petition for injunctive relief" to enforce the Commonwealth's sports wagering law at the Gaming Commission's request, G.L. c. 23N, § 4(g). The Attorney General brought the Commonwealth's enforcement action against Kalshi in that capacity. First Amended Complaint ¶¶ 1, 18, 221, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86.

67. The Gaming Commission "shall regulate the conduct of sports wagering" in Massachusetts, "shall have the authority to enforce" the sports wagering law, may impose civil penalties on "any person who violates" it, and "may request that the attorney general bring an action to enforce" it. G.L. c. 23N, §§ 4(a), (g), 21(a). The Gaming Commission made that request as to Kalshi, First Amended Complaint ¶ 221, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86, and has publicly taken the position that "offering sports-related event contracts in the Commonwealth is prohibited."[10]

68. Massachusetts law defines "illegal gaming" as "a banking or percentage game played with cards, dice, tiles, dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value," excluding, among other things, "sports wagering conducted under chapter 23N." G.L. c. 4, § 7, cl. 10. Chapter 271 of the General Laws criminalizes gaming and bookmaking outside those statutory exceptions. *See, e.g.*, *id.* c. 271, § 17.

69. In 2022, Massachusetts enacted a licensing regime for sports wagering. *See* St. 2022, c. 173, codified at G.L. c. 23N. The statute defines "sports wagering" as "the business of accepting wagers on sporting events or portions of sporting events . . . by any system or method of wagering approved by the commission," and a "wager" as "a sum of money or thing of value risked on an uncertain occurrence." G.L. c. 23N, § 3. It provides that "[a] person shall not engage in any activity in connection with sports wagering in the commonwealth unless

---

[10] Press Release, Mass. Gaming Comm'n, *Massachusetts Gaming Commission Issues Letter Restricting Sports Prediction Markets in the Commonwealth* (Nov. 13, 2025), https://massgaming.com/blog-post/massachusetts-gaming-commission-issues-letter-restricting-sports-prediction-markets-in-the-commonwealth/.

all required licenses have been obtained in accordance with this chapter and the rules and regulations of the commission." *Id.* § 5(a).

70. Sports wagering may be conducted in Massachusetts only by operators licensed by the Gaming Commission, and online sports wagering only under a "category 3 license," of which the Gaming Commission "shall issue no more than 7" that "are not connected to a category 1 or category 2 license." *Id.* §§ 3, 5(a), 6(b)(3). Category 1 and 2 licenses both require in-person sports wagering facilities. *See id.* 23N, § 3, 23K §§ 2, 9-11. Licensure is discretionary and conditioned on, among other things, a suitability investigation of the applicant and each person who controls it, substantial application, licensing, and assessment fees, and a 20 percent excise on mobile sports wagering receipts. *See id.* §§ 5(b), 6(d), 6(f), 7, 14(a)(ii), 15(e); 205 CMR 215.00 (2023). The Gaming Commission has, by its own account, issued nine sports wagering licenses, seven of which are actively operating. First Amended Complaint ¶ 55, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. A licensee may accept wagers only "from individuals physically located within the commonwealth." G.L. c. 23N, § 13(b).

## I. Defendants Have Enforced Massachusetts Law Against A CFTC-Regulated Prediction Market And Have Declared That Sports-Related Event Contracts Are Prohibited In Massachusetts

71. On September 12, 2025, the Attorney General filed a civil enforcement action in Suffolk Superior Court against Kalshi alleging that Kalshi was "offering sports wagering without a license in violation of G.L. c. 23N, § 5 et seq." Complaint ¶ 1, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025), Dkt. No. 1. The complaint alleged that Kalshi "operates a so-called prediction market through which" users "can engage in unlicensed gambling under the guise of trading event contracts," and specifically identified moneyline, point spread, over-under, proposition, parlay,

and exchange wagering contracts that Kalshi had self-certified with the CFTC. *Id.* ¶¶ 13, 94-104.

72. The Attorney General asserted that Kalshi's activities constitute unlicensed sports wagering under G.L. c. 23N, §§ 3 and 5(a), as well as "illegal gaming" under G.L. c. 4, § 7, cl. 10. *Id.* ¶¶ 88-92, 105-07, 155-61. Although the complaint itself cited the certifications Kalshi had filed with the CFTC for each of those contracts under Commission Regulation 40.2(a), *id.* ¶¶ 99-102 nn.11-16, it did not mention the CEA or the CFTC's exclusive jurisdiction over trading on designated contract markets. Nor does the Commonwealth's amended complaint. *See* First Amended Complaint ¶¶ 122-25 nn.15-19, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. The same day, the Attorney General moved for an emergency preliminary injunction enjoining Kalshi "from engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts." Emergency Motion for Preliminary Injunction at 1, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025), Dkt. No. 4.

73. The Commonwealth's complaint expressly targeted the intermediaries through which Kalshi's contracts are traded, alleging that "[t]he availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage." Complaint ¶ 129, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025), Dkt. No. 1. Kalshi removed the action to this Court on September 16, 2025, and this Court remanded it to the Superior Court on October 28, 2025. *Commonwealth v. KalshiEX LLC*, No. 1:25-cv-12595 (D. Mass. Oct. 28, 2025) (Stearns, J.), ECF No. 35.

74. On November 13, 2025, the Gaming Commission, through Defendant Serpa, sent a letter to every licensed sports wagering operator in Massachusetts stating that each licensee is "prohibited from offering sports-related event contracts in Massachusetts, directly or via an affiliate, related business entity, or other association, or directing patrons to such event contracts," warning that "the Commission may take steps up to and including revocation of your license," and demanding "a written response within ten business days identifying the steps you will take to ensure compliance."[11] In an accompanying press release, the Gaming Commission announced that "offering sports-related event contracts in the Commonwealth is prohibited."[12] The Gaming Commission has since reiterated that position: in a June 4, 2026 consumer advisory issued jointly with the Attorney General, Defendant Maynard stated that "prediction markets are illegally offering sports wagering without a license."[13]

75. On January 20, 2026, the Superior Court granted the Commonwealth's motion for a preliminary injunction and denied Kalshi's motion to dismiss, rejecting Kalshi's argument that the CEA preempts Massachusetts's sports wagering laws as applied to event contracts traded on a CFTC-designated contract market. Memorandum and Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Jan. 20, 2026), Dkt. No. 47. On February 6, 2026, the court entered an order enjoining Kalshi from

---

[11] Letter from Dean Serpa, Exec. Dir., Mass. Gaming Comm'n, to Sports Wagering Operators, at 1 (Nov. 13, 2025), https://massgaming.com/wp-content/uploads/MGC-Prediction-Markets-Letter-November-2025.pdf (hereinafter "November 13 Letter").

[12] *See* Press Release, Mass. Gaming Comm'n, *Massachusetts Gaming Commission Issues Letter Restricting Sports Prediction Markets in the Commonwealth* (Nov. 13, 2025), *supra* note 10.

[13] Press Release, Mass. Off. of the Att'y Gen., *AG's Office, Gaming Commission, and State Lottery Issue Consumer Advisory Ahead of 2026 FIFA World Cup* (June 4, 2026), https://www.mass.gov/news/ags-office-gaming-commission-and-state-lottery-issue-consumer-advisory-ahead-of-2026-fifa-world-cup.

"[o]ffering, listing, matching, executing, clearing, settling, or otherwise facilitating any contract" on "sporting events" to "any person located in Massachusetts." Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Feb. 6, 2026), Dkt. Nos. 56, 57. The Attorney General celebrated the ruling as "a major step toward fortifying Massachusetts' gambling laws," declaring that "[t]he Court has made clear that any company that wants to be in the sports gaming business in Massachusetts must play by our rules – no exceptions."[14]

76. Kalshi appealed the same day, and on February 17, 2026, a single justice of the Massachusetts Appeals Court stayed the preliminary injunction "pending further order of th[at] court or a single justice thereof" and ordered the appeal expedited. Order, *Commonwealth v. KalshiEX LLC*, No. 2026-J-0143 (Mass. App. Ct. Feb. 17, 2026) (Singh, J.). On March 5, 2026, the Supreme Judicial Court granted Kalshi's application for direct appellate review, and it heard argument on May 4, 2026. *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass.). The CFTC filed an amicus brief supporting Kalshi, explaining that the Commonwealth's enforcement action intrudes on the CFTC's exclusive jurisdiction. Brief for CFTC as Amicus Curiae Supporting Defendant-Appellant, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026). The Supreme Judicial Court's decision remains pending.

77. The Commonwealth has continued to escalate. On June 30, 2026, over Kalshi's opposition, the Superior Court allowed the Commonwealth to file an amended complaint adding seven counts under the Massachusetts Consumer Protection Act, G.L. c. 93A,

[14] Press Release, Mass. Off. of the Att'y Gen., *AG Campbell Secures Court Order That Will Block Kalshi from Offering Unlawful Sports Wagers in Massachusetts* (Jan. 20, 2026), https://www.mass.gov/news/ag-campbell-secures-court-order-that-will-block-kalshi-from-offering-unlawful-sports-wagers-in-massachusetts.

§ 2. First Amended Complaint ¶¶ 1, 228-77, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86; Memorandum and Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 87. The amended complaint alleges that offering sports-related event contracts without a Gaming Commission license is itself an unfair and deceptive practice, that "[e]ach wager" is "a separate violation" of chapter 93A, and that describing event contracts as "legal," "regulated," or "trading" deceives consumers; it seeks monetary relief, restitution, civil penalties of up to $5,000 for each violation, and a permanent injunction, and demands a jury trial. First Amended Complaint ¶¶ 14-17, 139, 234, 242, 271, 275 & Prayer for Relief ¶¶ C-H, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. The Commonwealth continues to prosecute the action in the trial court while Kalshi's appeal is pending, and Kalshi's motion to dismiss the amended complaint will be heard in October 2026. Notice of Motion to Dismiss, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Aug. 14, 2026), Dkt. No. 89; Endorsement on Joint Motion to Establish Briefing Schedule, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Aug. 31, 2026), Dkt. No. 90.

78. Defendants' theory applies with equal force to Underdog. Under Defendants' view, any DCM or FCM that makes sports-related event contracts available to persons located in Massachusetts without a Gaming Commission license violates Massachusetts law, irrespective of the CFTC's designation of the market or its treatment of the contract. *See* First Amended Complaint ¶¶ 10, 111-34, 219-27, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. That is why Robinhood Derivatives, LLC ("Robinhood"), an FCM, QCX LLC d/b/a Polymarket US

("Polymarket"), a DCM, and Ludlow Exchange, LLC d/b/a Novig ("Novig"), a DCM, have each filed preemption actions in this District seeking to enjoin Defendants from enforcing Massachusetts law against their participation in transactions involving event contracts traded on federally designated contract markets. *See Robinhood Derivatives, LLC v. Campbell*, No. 1:25-cv-12578 (D. Mass. filed Sept. 15, 2025), *appeal docketed*, No. 26-1257 (1st Cir. Mar. 23, 2026), ECF No. 110; *QCX LLC v. Campbell*, No. 1:26-cv-10651 (D. Mass. filed Feb. 9, 2026); *Ludlow Exch., LLC v. Campbell*, No. 1:26-cv-13615 (D. Mass. filed Aug. 7, 2026).

### J. The CFTC Has Made Clear That Compliance With Demands Like Massachusetts's Violates The CEA's Core Principles

79. As required by the CEA, the CFTC has adopted regulations setting out these "Core Principles," which DCMs must follow. One such regulation, Core Principle 2, requires DCMs to offer "impartial access" to their markets and services to users across the country. *See* 17 C.F.R. § 38.151(b). The CFTC has explained that a patchwork of differing state regulations would undermine this obligation—not to mention the purpose of the CEA—"because a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide." Complaint ¶ 78, *United States & CFTC v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), ECF No. 1. It also stated that states' "attempt to regulate and seek civil injunctions and penalties against DCMs and FCMs," like Underdog, "directly violate[s] and undermine[s] the CFTC's regulation requiring 'impartial access' to all eligible participants nationwide." *Id.* ¶ 66-67 (citing 17 C.F.R. § 38.151(b)). The same is true of Massachusetts's regime, which permits a licensee to accept wagers only "from individuals physically located within the commonwealth" and requires that "[a]ll bets . . . be initiated, received and otherwise made within the commonwealth." G.L. c. 23N, § 13(b). The CFTC has told the Supreme Judicial Court the same thing: because a DCM "is required by federal law to provide 'impartial

access' to all eligible participants nationwide," complying with both Massachusetts's gambling laws and the CEA "is impossible." Brief for CFTC as Amicus Curiae Supporting Defendant-Appellant at 39, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026).

80. The CFTC has made clear that compliance with state enforcement actions would violate the Core Principles, bringing DCMs out of compliance with their obligations under the CEA. For instance, on August 11, 2026, the CFTC issued an emergency order directing Kalshi and its affiliates to continue to perform its functions as an exchange in response to New York's ongoing enforcement action against Kalshi.[15] The CFTC stated that compliance with New York's proposed TRO, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" *Id*. at 8-9 (citing 7 U.S.C. §§ 7(d)(4), 7(d)(9)). Similarly, on July 14, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business."[16] The CFTC found that the Michigan court's "unprecedented order" constitutes a "'major market

[15] Order Directing Kalshi to Continue Exercising DCM Functions at 9, In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration, CFTC (August 11, 2026), https://www.cftc.gov/PressRoom/PressReleases/9281-26 (hereinafter "New York CFTC Order").

[16] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, In re Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Commission Regulation 40.6(a), CFTC (July 14, 2026) at 3, 9, https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter "Michigan CFTC Order").

disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts" and that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 6-8. The CFTC's directives in its orders, both in New York and Michigan, would apply to Underdog with equal force here and nationwide. Indeed, the preliminary injunction Defendants obtained against Kalshi—which prohibits "matching, executing, clearing, settling, or otherwise facilitating" any sports-related contract for "any person located in Massachusetts," Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Feb. 6, 2026), Dkt. Nos. 56, 57—would compel precisely the disruption of open positions and of the cash-settlement process that the CFTC has found to violate Core Principle 4.

### K. Defendants' Anticipated Enforcement Against Underdog Will Irreparably Harm Underdog And Preclude Its Ability To Comply With Federal Regulations

81. The threat of enforcement against Underdog is real, imminent, and concrete. Given Massachusetts's definitive position on prediction markets—which has already prompted an enforcement action and preliminary injunction against a prediction market company and a directive from the Gaming Commission that sports-related event contracts are "prohibited" in Massachusetts—there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Underdog and its customers to irreparable harm. *See Morales*, 504 U.S. at 381 (no adequate remedy at law where attorneys general had "made clear" they would seek to enforce state law and thus "enforcement actions [were] imminent"). The prospect of an imminent enforcement action leaves Underdog with a "Hobson's choice" wherein both its options are certain to cause irreparable harm: either Underdog can "suffer the injury of obeying [Massachusetts's] law" despite the fact that it is

preempted, or it can continue to operate in Massachusetts, "expos[ing] [itself] to potentially huge liability." *Id.*

82. If Underdog complies with Massachusetts's wrongful assertion of its authority over DCMs by ceasing to offer event contracts in Massachusetts, it will violate the CFTC's Core Principles, bringing Underdog out of compliance with its obligations under the CEA. *See supra* § J. Indeed, in response to New York's enforcement action against Kalshi, the CFTC stated that New York's proposed temporary restraining order would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. §§ 7(d)(4), 7(d)(9)). Similarly, in response to Kalshi's notification that it planned to liquidate open derivative positions to comply with a state court order in Michigan, the CFTC stated that such a plan would "violate CEA Core Principle 4." Michigan CFTC Order at 8.

83. Compliance with Massachusetts's demands would also be extremely costly and would cause reputational and competitive injury, particularly damaging to such a new DCM fighting for market share. Any economic losses Underdog incurs from ceasing operations would be unrecoverable because sovereign immunity bars recovery for monetary damages, causing Underdog irreparable harm. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999); *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221-23 (1st Cir. 2003) (where "money damages are unavailable against the Commonwealth" and its officials, that unavailability "goes a long way toward establishing irreparable injury," because the plaintiff "may . . . never be able to recoup" its losses); *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484-85 (1st Cir. 2009)

(affirming finding that economic losses inflicted by regulatory regime were irreparable); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'"). Injury to Underdog's reputation and goodwill is likewise irreparable. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("[I]njury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

84. Further, even adherence to Massachusetts's sports wagering license requirements would not be sufficient to prevent irreparable harm. As a federally regulated DCM and FCM, applying for a state license would require Underdog to ignore the law—which mandates that Underdog obtain federal, not state, approval to operate—and abandon the federal rights it has obtained through its successful application to the CFTC for designation. Moreover, Underdog cannot guarantee it would obtain a license through the Gaming Commission's discretionary suitability review process. *See* G.L. c. 23N, § 5(b)-(c); 205 CMR 218.00. Indeed, the Gaming Commission may issue "no more than 7" untethered category 3 licenses, G.L. c. 23N, § 6(b)(3), and it has, by its own account, already issued seven active sports wagering licenses. *See* First Amended Complaint ¶ 55, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. Further, it has already declared that sports-related event contracts are "prohibited" in Massachusetts and threatened its own licensees with license revocation for offering them—making it highly unlikely that the Gaming Commission would license Underdog to do precisely that. *See* November 13 Letter at 1. And even if a license were available, chapter 23N would require Underdog to accept orders only from persons "physically located within the commonwealth," G.L. c. 23N, § 13(b),

and to replicate that geographic partitioning in every other State, depriving its markets of the nationwide liquidity on which they depend and violating the CEA's requirement that a DCM provide "impartial access" to all eligible participants. *See* 17 C.F.R. § 38.151(b).

85. On the other hand, if Underdog refuses to acquiesce to Massachusetts's wrongful position, it will almost certainly become subject to enforcement efforts, as shown by Massachusetts's enforcement against Kalshi, the Gaming Commission's November 13 Letter, Defendants' roles in enforcing Massachusetts gambling law, and Defendants' public statements committing to continue enforcing state law against prediction markets. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))).

86. The Attorney General launched her enforcement action against Kalshi after Kalshi self-certified and listed sports-related event contracts that were available to users located in Massachusetts through Kalshi's own platform and through intermediaries such as Robinhood, alleging that Kalshi's users thereby "engage in unlicensed gambling under the guise of trading event contracts." Complaint ¶¶ 13, 48, 80, 94-104, 129, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sept. 12, 2025), Dkt. No. 1. Just like Kalshi, Underdog lists sports-related event contracts on its CFTC-designated contract market and makes them available to users through a mobile application and an internet website,[17] and, like Robinhood, Underdog intermediates its customers' transactions in event contracts listed on other DCMs through its CFTC-registered FCM.

---

[17] Underdog, underdogsports.com.

87. The penalties for Underdog's non-compliance with an inapplicable state regulatory regime will be significant, and may be both criminal and civil. The Commonwealth has alleged that Kalshi is liable under G.L. c. 23N, §§ 3 and 5(a) (unlicensed sports wagering); G.L. c. 4, § 7, cl. 10 (illegal gaming); and G.L. c. 93A, § 2 and 940 CMR 3.16(3) and 30.04(1) (unfair or deceptive acts or practices). First Amended Complaint ¶¶ 1, 131-34, 219-77, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. Any person who violates chapter 23N is subject to a civil penalty of up to $2,000 for each violation or $5,000 for violations arising from the same series of events, G.L. c. 23N, § 21(a), and each violation of chapter 93A carries a civil penalty of up to $5,000, together with restitution and the Commonwealth's attorneys' fees and costs, G.L. c. 93A, § 4. Because the Commonwealth's position is that "[e]ach wager" is "a separate violation," First Amended Complaint ¶ 242, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86, those penalties—applied trade-by-trade to an active exchange—would be ruinous. Whoever, "other than an operator under [chapter 23N], engages in accepting, facilitating or operating a sports wagering operation" is further subject to imprisonment for up to 90 days and a fine of up to $10,000 for a first offense, escalating to imprisonment in state prison for up to nine years and a fine of up to $100,000 for a third or subsequent offense. G.L. c. 23N, § 21(a).

88. The relief the Commonwealth has sought against Kalshi confirms the severity of the threat. The Attorney General obtained an order prohibiting Kalshi from "[o]ffering, listing, matching, executing, clearing, settling, or otherwise facilitating" any sports-related contract for "any person located in Massachusetts," Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Feb. 6, 2026), Dkt. Nos. 56, 57—an

order that, had it not been stayed pending appeal, would have forced a federally designated exchange to unwind or refuse to settle open positions in violation of the CEA's Core Principles, *see supra* § J—and now seeks monetary relief, restitution, civil penalties of up to $5,000 for each alleged violation, permanent injunctive relief, and attorneys' fees. First Amended Complaint, Prayer for Relief ¶¶ C-H, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. June 30, 2026), Dkt. No. 86. As the CFTC found in the analogous context of New York's enforcement action against Kalshi, such an assertion of state authority "cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets," New York CFTC Order at 5, and permitting it to proceed would mean "a single State will effectively become the nationwide regulator of event-contract swaps on DCMs" and "threaten[] to unsettle derivatives markets generally." *Id.* at 5, 9.

89. Accordingly, Underdog has no plain, speedy, or adequate remedy at law to address the wrongs described herein and thus seeks injunctive and declaratory relief.

**COUNT I**
**(Express Preemption – Against All Defendants)**

90. Plaintiffs incorporate all prior paragraphs by reference.

91. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

92. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

93. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Massachusetts law, and without regard to whether Defendants have correctly interpreted Massachusetts law, Massachusetts law is preempted pursuant to the Supremacy Clause. Congress has expressly reserved exclusive authority over trading on federally regulated derivatives markets by giving the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges and thus to determine whether trading in particular event contracts is permitted. 7 U.S.C. § 2(a)(1)(A). Granting exclusive jurisdiction to the CFTC aligned with Congress' intent in enacting the CEA, which focused on establishing a unified approach to derivatives regulation and preventing patchwork state regulation, which Congress believed would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

94. Courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *Flaherty*, 172 F.4th at 228; *United States & CFTC v. Minnesota*, No. 26-cv-2661 (KMM/DTS), 2026 WL 2150211, at *9-11, 13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

95. To the extent that Massachusetts is attempting to enforce its laws, including G.L. c. 23N, §§ 3, 5(a), 6, 11, 13, 14, 15, and 21; G.L. c. 4, § 7, cl. 10; G.L. c. 271; 205

CMR 202-258; G.L. c. 93A, § 2; and 940 CMR 3.16(3) and 30.04(1) (collectively, the "challenged provisions"), against federally regulated derivatives markets, Massachusetts's enforcement is preempted. By threatening to enforce those or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

96. Therefore, Defendants may not enforce Massachusetts's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**<u>COUNT II</u>**
**(Field Preemption – Against All Defendants)**

97. Plaintiffs incorporate all prior paragraphs by reference.

98. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

99. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Massachusetts law, and without regard to whether Defendants have correctly interpreted Massachusetts law, Massachusetts law is preempted pursuant to the Supremacy Clause.

100. As courts have recognized, "the CEA is recognized as establishing 'a comprehensive system for regulating futures contracts and options'" that grants the CFTC exclusive jurisdiction. *See, e.g.*, *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194-95 (D. Colo. 2007) (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)). That system includes

creating the CFTC and vesting it with exclusive authority to regulate derivatives trading, including event contracts. *See* 7 U.S.C. §§ 1 *et seq*.

101. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that leaves no room for parallel state regulation over which event contracts can be restricted.

102. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, enforcement of Massachusetts's laws against federally regulated derivatives markets is field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228-29. Accordingly, by threatening to enforce the statutes referenced at ¶ 95 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

103. Therefore, Defendants may not enforce Massachusetts's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT III**
**(Conflict Preemption – Against All Defendants)**

104. Plaintiffs incorporate all prior paragraphs by reference.

105. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

106. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Massachusetts law, and without regard to whether

Defendants have correctly interpreted Massachusetts law, Massachusetts law is preempted pursuant to the Supremacy Clause.

107. Defendants' attempts to ban and/or regulate event contracts that federal law and the CFTC have authorized plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 229-30.

108. By threatening to enforce the statutes referenced in ¶ 95 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

109. Therefore, Defendants may not enforce Massachusetts's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## **PRAYER FOR RELIEF**

An actual controversy exists between Underdog and Defendants regarding whether Defendants have legal authority to regulate the trading of event contracts not licensed by the Massachusetts Gaming Commission.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgment under 28 U.S.C. §§ 2201-2202 stating that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its

involvement in transactions on designated contract markets, violate the Supremacy Clause and are therefore preempted and unconstitutional;

2. Issue a permanent injunction enjoining Defendants, their officers, employees, successors, and agents, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets;

3. Award any other relief within this Court's discretion that it deems just and proper.

Dated: September 8, 2026
Boston, Massachusetts

Respectfully submitted,

*/s/ James R. Carroll*
James R. Carroll (BBO #554426)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com

Robert A. Fumerton
(*pro hac vice* forthcoming)
David Meister
(*pro hac vice* forthcoming)
Judith A. Flumenbaum
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
robert.fumerton@skadden.com
david.meister@skadden.com
judy.flumenbaum@skadden.com

*Counsel for Plaintiffs*
*Underdog Exchange DCM, Inc. and*
*UDM, LLC d/b/a Underdog Predict*